UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAMUEL SMALL,

                              Plaintiff,

                    v.

CITY OF NEW YORK, *et al.*,

                              Defendants.

09-CV-1912 (RA)

<u>OPINION & ORDER</u>

RONNIE ABRAMS, United States District Judge:[1]

        In March 2009, Plaintiff Samuel Small initiated this civil rights action pursuant to 42

U.S.C. § 1983 against the City of New York, the warden of a correctional facility on Rikers

Island, and three of its correction officers.  Small alleged that he was attacked by members of a

violent gang—the Bloods—on three separate occasions between October 2006 and March 2009

while he was in the custody of the New York City Department of Correction ("DOC") as a

pretrial detainee.  Small, who has never been affiliated with any gang himself, claimed that his

constitutional rights were violated when Defendants failed to protect him from these attacks.  In

particular, he has asserted that the City of New York failed to adopt and implement policies, and

to train its officers, to protect detainees from a known threat of gang violence.  After a five-day

trial, the jury returned a verdict in favor of the four individual Defendants but against the City on

Small's claim of municipal liability.  The jury awarded Small $1.5 million in damages.

        Now before the Court is the City's motion for judgment as a matter of law, a new trial, or

remittitur of the damages award.  For the reasons that follow, the motion is denied.

---

[1] On February 20, 2020, this case was reassigned from Judge Batts to this Court.

**BACKGROUND**

Familiarity with the facts and procedural history of this case is assumed.  The Court here provides a brief overview of the evidence adduced at trial that is relevant to the instant motion.

*The Attacks on Mr. Small*

In 2006, Plaintiff was a pretrial detainee housed at the Otis Bantum Correctional Center (OBCC) on Rikers Island.  Trial Transcript ("Tr.") at 44-45.[2]  He testified that at some point in September 2006, he was approached by another detainee—a member of the Bloods—who asked him to transport contraband.  *Id.*  When Plaintiff refused, the other detainee assaulted him, threatened his life, and warned that he would "send his people to get [him]." [3]  *Id.*  The DOC arranged for an emergency transfer of Plaintiff to the George Motchan Detention Center (GMDC), another Rikers facility.  *Id.*

On October 14, 2006, Plaintiff was watching TV in the dayroom when another inmate ran in, approached him from behind, and cut him behind his right ear.  Tr. at 39-41.  After assaulting Plaintiff, the attacker yelled, "Get 'em, Blood!"  *Id.* at 42.  A second inmate then ran over and began punching Plaintiff.  *Id.*  The officer supervising the area yelled at them to stop, but her commands were largely ignored.  *Id.* at 299, 319.  Eventually, other prison officials arrived as backup and were able to put a stop to the assault.  *Id.* at 319-20.  Plaintiff was taken to the detention facility's clinic and then to urgent care, where his two-and-a-half-inch cut was glued shut.  *Id.* at 48-49.  Later that day, he was transferred out of One Main, a general population housing unit, and into Three Main, a higher security, administrative segregation housing unit.  *Id.*

---

[2] The trial transcript is located at Dkts. 351 (pages 1-114), 353 (pages 115-327), 355 (pages 328-488), 357 (pages 489-759), 359 (pages 760-901), 361 (pages 902-1003), and 363 (pages 1004-1017).
[3] Because this assault occurred outside of the statute of limitations period, it does not form the basis of the City's liability in this case.  Nevertheless, the incident bears mentioning because it provides context as to how Plaintiff came to be targeted by the Bloods.  For clarity, the October 14, 2006 attack—the first one within the statute of limitations period—is referred to hereafter as the first incident.

at 53.  In administrative segregation housing, an inmate's movements are more limited and more

closely monitored.  *Id.* at 456.  Plaintiff testified that he told prison officials that he did not want

to be moved into Three Main because there were more Bloods there, but he was transferred

nonetheless.  *Id.* at 53-54.

The next day, on October 15, Plaintiff again ate dinner and watched TV in the dayroom.

*Id.* at 152-55.  He testified that after dinner, he told the correction officer escorting him that he

wanted to get some water before being locked back into his cell.  *Id.* at 61.  Plaintiff explained

that he expected the officer to wait for him by his cell.  *Id.*  But by the time Plaintiff returned, the

correction officer was no longer there.  *Id.*  Between ten and a dozen inmates then rushed into his

cell and began beating him.  *Id.* at 62.  As they hit him, the inmates yelled, "Kill 'em, Blood!"

*Id.* at 63.  Plaintiff testified that he fought his way out of the cell and ran to the end of the

housing tier, but was unable to attract the attention of the officer monitoring the area from the

"bubble" because he was asleep.  *Id.* at 64-65.  The group of men continued to beat him until,

eventually, the security team arrived and stopped the attack.  Plaintiff was taken to the clinic

again, laid on a backboard and put in a neck brace, and then sent to the hospital.  *Id.* at 68-69.

His wound from the previous day had reopened, his eyes were swollen shut, and he had

abrasions all over his body.  *Id.* at 69-70.  Plaintiff testified that he suffered from dizziness,

flashbacks, nausea, and vomiting for days after the attack.  *Id.* at 94.

On October 16, a correction officer wrote a memo to then-warden of GMDC Emmanuel

Bailey, informing him that a member of the Bloods had told him that there was a "hit" out on

Plaintiff.  *Id.* at 222; Ex. 82.  A second correction officer sent a similar report to Warden Bailey

the same day, advising him that a confidential informant had warned that Plaintiff would not be

safe if he stayed in the building.  Tr. at 228; Ex. 83.  When asked at trial what he did in response

to these memos, Warden Bailey testified that "the response was [] taken care of" by his team. Tr. at 225.  When asked whether he forwarded these memos to the Gang Intelligence Unit (GIU) at Rikers, Warden Bailey responded, "Hopefully my security team did that part."  *Id.*  He also testified that he could not recall any other instance of receiving a memo about hits on a detainee's life during his tenure as warden of GMDC.  *Id.* at 226.

Plaintiff testified that he was never told that the Bloods had ordered a hit on him.  *Id.* at 127.  After the second incident, Plaintiff was moved into close (or protective) custody for his safety.  *Id.* at 84.  Close custody, like punitive segregation, entails being locked in one's cell for 23 hours each day, with one hour allotted for recreation.  *Id.* at 84, 512, 553.  All meals are served in the cell.  *Id.* at 512.  Close custody differs from punitive segregation, however, in that the inmate retains certain privileges like religious services or law library access.  *Id.* at 513, 553. Plaintiff explained that he did not like being held in close custody and, after three days, asked to be removed.  *Id.* at 85-86, 166.  On November 13, 2006, in connection with his removal from close custody, Plaintiff told an investigator that he did "not feel that his life [was] in danger from the Bloods."  *Id.* at 167.  Eventually he was taken out of close custody and transferred to another facility, George R. Vierno Center (GRVC), where he lived without incident for two years.  *Id.* at 95-96.  Plaintiff testified that he felt safer in this housing unit because it was dominated by the Crips rather than the Bloods.  *Id.* at 96.

Plaintiff briefly left DOC custody in September 2008.  *Id.* at 128.  He testified that when he returned to Rikers in November 2008, he was placed in the Anna M. Kross Center (AMKC)— according to him, another building "flooded with Bloods"—against his wishes and despite telling the security captain that he had been attacked by the Bloods before.  *Id.* at 99-100.  On March 9, 2009, Plaintiff was assaulted a third time.  *Id.* at 104-06.  During trial, the parties disputed the

circumstances of the third attack.  The City presented evidence that a fight broke out between

Plaintiff and another inmate when that inmate demanded that Plaintiff give up his job as a

Suicide Prevention Aide (SPA) and he refused, *id.* at 459, while Plaintiff denied that his attacker

said anything about the SPA assignment, *id.* at 134.  He testified that he was just watching TV in

the dayroom when another inmate grabbed him from behind and placed a razor against his neck.

*Id.* at 106.  Plaintiff explained that he pressed the blade into his own face to protect himself from

getting slashed.  *Id.*  Two other attackers joined in and started punching Plaintiff on his face,

head, and neck.  *Id.* at 106-07.  The security team eventually arrived and broke up the attack.  *Id.*

Plaintiff was taken to the clinic infirmary to treat the cut on his face.  *Id.* at 107.  All three of his

attackers were later identified as members of the Bloods.  *Id.* at 108, 444-445.

Plaintiff began receiving mental health treatment after the second assault.  He was

evaluated on a monthly basis, beginning in December 2006, by a mental health clinician

affiliated with the prison who concluded that Plaintiff suffered from PTSD and depression during

this time.  *Id.* at 265-75; *see* Exs. F-18 to F-28.

*Relevant Practices and Policies*

During trial, the jury heard testimony that the City had formed a special division to track

gang (also known as "security risk group" or SRG) activity at Rikers called the Gang

Intelligence Unit.  Tr. at 182-83, 517.  Its purpose was to "collect information on who was an

SRG member" through self-reporting and investigation and to compile the information into a

"very distinct database" about gang affiliations.  *Id.* at 186-87.  The information was updated on

a daily basis and distributed to all of the housing units.  *Id.* at 542-43, 188-89.  Active

membership in a gang could also cause an inmate to be given "CMC" (centrally monitored case)

status.  *See* Ex. 23.  CMCs are inmates who are "under constant observation and supervision by the department" and who are escorted by officers everywhere they go.  Tr. at 789.

In January of 2007—after the first two attacks on Mr. Small—the City issued a "vulnerable inmates" memo and implemented a system for tracking and housing inmates it considered to be "vulnerable."  *Id.* at 524; Ex. 29.  "Vulnerable inmates" were defined by the DOC as those who are frail, handicapped, young, members of the LGBTQI+ community, or who suffer from various mental infirmities.  Ex. 113.  Inmates who were not affiliated with a gang, who had a history of being targeted by gangs, or who had been the victims of prior attacks by gangs were not tracked nor classified as "vulnerable."  Assistant Deputy Warden Ottaviano testified that it would not be feasible to classify these inmates as "vulnerable" because non-affiliation with a gang is "too widespread" and it would lead to "too many inmates in protective custody."  Tr. at 519.

The jury heard evidence regarding several different kinds of safety mechanisms the City had put in place to limit violence in its correction facilities.  Warden Bailey testified about the DOC's close custody housing policy, issued by DOC Commissioner Horn, which called for "vulnerable" inmates to be housed in close custody as a form of protection.  *Id.* at 244; Ex. 29.  The DOC followed this policy with respect to Plaintiff after the second and third attacks.  Tr. at 83, 139.  Additionally, Assistant Deputy Warden Ottaviano testified that separation orders would be used to physically separate inmates who had been involved in a violent incident with one another for the remainder of their incarceration.  *Id.* at 527.  The DOC also had a "serious verified threat" protocol in place for when detainees would threaten correction employees or their families.  Ex. 24b.  This protocol, however, did not extend to detainees threatened by other detainees.  Tr. at 546-47.

As for training, each of the three correction officers named as individual Defendants testified that they had been trained to identify SRG members while at the correction academy. *Id.* at 856, 865, 877.  However, they were not trained to limit or curb the influence of SRGs.  *Id.* One of the individual Defendants testified that he had received training while at the academy on how to identify and protect "vulnerable" inmates, *id.* at 865-66, while the other two could not recall undergoing such training or recall the substance of that training, *id.* at 857, 877.

*The DOC's Awareness of Gang Violence*

Several City employees testified about gang violence being a "big problem" at Rikers that only grew over time.  *See* Tr. at 185.  Assistant Deputy Warden Ottaviano testified that "SRGs are responsible for a lot of the violence on Rikers Island and in many correctional facilities" and that "identifying SRG members . . . was a focus during [his] entire career . . . [and] became more and more important over the years."  *Id.* at 518.  Chief Walsh, the warden of GMDC before Warden Bailey, noted that in 2006, about 60 to 70% of all the stabbing and slashing incidents that occurred at Rikers were perpetrated by members of the Bloods.  *Id.* at 685.  Additionally, Plaintiff introduced evidence that the City was on notice of the threat of gang violence at Rikers through three civil complaints filed against the City and a press release, all of which pertained to incidents where pretrial detainees were allegedly assaulted by other detainees. Two of these attacks involved the Bloods.  *See* Exs. 36, 33.  At the time the documents were admitted, the Court instructed the jury that complaints "contain allegations rather than statements of proven facts" and that it should not assume the truth of such allegations.  Tr. at 715.

*Jury Instructions and Verdict*

At trial, the jury was instructed that in order to hold the City liable under Section 1983, it must find, by a preponderance of the evidence, that: "(1) the City ha[d] an unconstitutional

policy, practice, or custom, and (2) that policy, practice, or custom caused a deprivation of the

plaintiff's rights." Jury Instructions (Dkt. 350-3) at 15-16. As to the first element, the jury was

advised that the City "need not have formally adopted or announced the practice or custom for it

to be 'official'" and that "inaction constitutes an official policy, practice, or custom" when "the

City has failed to act in the face of known constitutional violations and [] its inaction was the

result of a conscious choice rather than mere negligence." *Id.* at 16. The Court further instructed

that "[m]unicipal liability may be premised on a failure to train employees if inadequate training

reflects deliberate indifference to the constitutional rights of the City's inhabitants." *Id.* at 17.

As to the second element, the jury was advised that, in order to hold the City liable, it must find

that "[Plaintiff's] constitutional rights were violated either by the individual [D]efendants or by

some other City employee or employees" and that "the City's policy, practice, custom, or lack

thereof—or its failure to train its employees—caused the constitutional violation at issue." *Id.* at

16, 18.

      The jury ultimately returned a verdict in favor of all of the individual Defendants but

against the City. Specifically, as detailed on the special verdict form, it found that "a City

employee violated [Plaintiff's] constitutional rights in connection with the alleged assaults that

occurred on October 14 and 15, 2006 and March 9, 2009;" that the City "had an unconstitutional

policy, practice, or custom, or that it consciously chose not to implement a policy, practice, or

custom, despite knowing that its failure to do so would lead to constitutional violations;" and that

"this policy, practice, or custom—or lack thereof—caused [Plaintiff's] injuries or harm."

Verdict Form (Dkt. 350-8) at 4. It also found that the City's failure to "properly train its

employees . . . caused [Plaintiff's] injuries or harm." *Id.* at 5. The jury awarded Plaintiff $1.5

million in compensatory damages. *Id.*

## DISCUSSION[4]

The City now moves for judgment as a matter of law under Federal Rule of Civil Procedure 50 on the grounds that Plaintiff failed to introduce any evidence establishing that his underlying constitutional injury was due to a policy or practice of the City or a failure to train City employees.  In the alternative, the City moves for a new trial under Federal Rule of Civil Procedure 59(a)(1) due to purported errors in the Court's evidentiary rulings, or remittitur of the damages award under Rule 59(e).  The Court considers each of these applications in turn.

## I.      Motion for Judgment as a Matter of Law

### A.  Legal Standard

A court may only grant judgment as a matter of law if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  That burden is "particularly heavy" where, as here, "the jury has deliberated in the case and actually returned its verdict" in favor of the non-movant.  *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005).  Under such circumstances, a court may set aside the verdict only if there exists "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it."  *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).  The Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility assessments or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  In short, a Rule 50 motion may be granted only if the Court, viewing the evidence in the light most

---

[4] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

favorable to the non-movant, concludes that "a reasonable juror would have been *compelled* to accept the view of the moving party." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (emphasis in original).

### B.  Municipal Liability Under Section 1983

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.  A municipality may be liable under Section 1983 when it, "under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978).  To prevail on a *Monell* claim, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007).  Importantly, Section 1983 does not "impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Monell*, 436 U.S. at 692.  Instead, "plaintiffs who seek to impose liability on local governments under § 1983 must prove that action pursuant to official municipal policy caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). Official municipal policy "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.*  It also may include a city's "policy of inaction," which, "in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Id.* at 61-62.  Here, the City argues that the evidence adduced

at trial was insufficient to permit the jury to find that any constitutional violation was caused by DOC policy or lack thereof.  The Court disagrees.

### C.  Sufficiency of the Evidence

*Unconstitutional Practice, Policy, or Custom*

The Constitution requires municipalities to take reasonable measures to guarantee the safety of inmates in their custody.  *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) ("[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.") (citing *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)); *Villante v. Dep't of Corr.*, 786 F.2d 516, 519 (2d Cir. 1986) (noting that the City has an affirmative duty to protect those held in its custody); *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general wellbeing.").  "The existence of an affirmative duty to protect does not mean that any harm that befalls a person in state custody necessarily manifests a municipal policy of deliberate indifference to prisoner safety.  But an affirmative duty, by its nature, implies a proactive responsibility to assess the risks of harm presented by given circumstances and to take reasonable preventive measures in advance of harm occurring, not simply to respond to harms only after they occur."  *Cash*, 654 F.3d at 335.

Plaintiff's theory of municipal liability at trial was not that any formal policy officially endorsed by the City caused his injury.  Rather, it was that "the City knew . . . about widespread gang violence at Rikers but failed to adopt adequate policies, practices, or training to prevent it."  Pl.'s Opp. (Dkt. 384) at 11.  The law is clear that *Monell* liability can be premised on either the existence of an unconstitutional policy or the unconstitutional absence of a policy.  *See Cash*,

654 F.3d at 334 ("A municipal policy may be pronounced or tacit and reflected in either action or inaction."); *Connick*, 563 U.S. at 61-62.[5]  Consistent with this principle, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Cash*, 654 F.3d at 334. But the Supreme Court has cautioned that "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61.  To prevail under this theory, a plaintiff must establish "that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious, and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004).  In other words, the "operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a conscious choice rather than mere negligence." *Id.*

The jury's verdict in this case was based on a finding that the City's "policy, practice, or custom—or lack thereof" and its failure "to properly train its employees" caused Plaintiff's injuries or harm.  In both respects, there was a sufficient evidentiary basis for the jury to find in favor of Plaintiff.

First, Plaintiff presented evidence at trial that the City was on notice of the risk that pretrial detainees could be violently attacked or even killed by gangs while in custody.  Multiple City employees testified that gang violence was "a big problem." *See, e.g.*, Tr. at 518 ("SRGs

---

[5] The City's first argument—that Plaintiff has failed to pinpoint the existing DOC policy or procedure that caused his constitutional injury, *see* Def.'s Br. (Dkt. 376) at 12-13—is thus unavailing.  The jury was entitled to find that Plaintiff's injury was caused by a deficiency in or absence of DOC policy.

are responsible for a lot of the violence on Rikers Island and in many correctional facilities . . . a lot of times, there would be an affiliation with the inmates that were involved in a violent incident."); *id.* at 198 ("SRGs used to cut people."); *id.* at 768 ("Q: Did the GIU know the Bloods to be a violent group?  A: Bloods as well as the Crips and Latin Kings, yes.  Q: Were the Bloods frequently involved in slashings on Rikers?  A: Yes.").  The evidence showed that in an effort to combat the problem, the DOC established the Gang Intelligence Unit in the 1990s to monitor gang activity and "collect information on who was an SRG member."  Tr. at 186.  And around the time that Plaintiff was assaulted, at least three other civil actions were brought against the City by pretrial detainees who alleged that the City and its employees had failed to protect them from violent attacks by other inmates.[6]  *See* Exs. 34, 36, 117.  Plaintiff also introduced one press release announcing the conviction of a Bloods member for his murder of another Rikers detainee in October 2004.  *See* Ex. 33.[7]  Based on all of this evidence, the jury could have reasonably concluded that the City was aware of a "potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious."  *Amnesty Am.*, 361 F.3d at 128.

Next, Plaintiff presented evidence that, despite its awareness that gang violence was a serious problem at Rikers, the City did not have a formal policy in place to proactively protect detainees—other than the few who qualified as "vulnerable" pursuant to the 2007 memo,

---

[6] The City's argument that the Court improperly took judicial notice of these complaints is addressed in Section II.B, *infra*.

[7] The City asserts that Plaintiff has not demonstrated an unconstitutional pattern or practice, arguing that "[t]hree lawsuits and a press release do not a 'practice or custom' make."  Def.'s Br. at 16.  It cites *Walker v. City of New York* for the proposition that even 10 other complaints are "plainly insufficient to plausibly allege a custom or practice so persistent and widespread as to practically have the force of law."  No. 12 CIV. 5902 PAC, 2014 WL 1259618, at *3 (S.D.N.Y. Mar. 18, 2014) ("The paltry number of complaints (none resulting in an adjudication of liability) . . . hardly suggests the frequency or pervasiveness of the purported custom that is required to state a *Monell* claim.").  But unlike in *Walker*, here, Plaintiff introduced the complaints and press release for the purpose of establishing the fact of such other litigation—and thus notice of the conditions at issue—rather than as substantive evidence of the existence of a practice or custom.  *See* Tr. at 958.

discussed further below—from gang attacks.  No City employees, for example, identified a DOC policy or practice for protecting detainees who had been explicitly threatened or repeatedly attacked by members of SRGs.  Warden Bailey testified that SRG members who attacked other detainees would be rearrested and criminally prosecuted—not just infracted, as had been the DOC's practice in the past.  Tr. at 198.  He explained that rearrest was the DOC's "biggest tool" against SRG attacks.  *Id.*  But by its very nature, rearrest is reactive rather than proactive—it only happens after the victim has already been assaulted, and in extreme cases, killed.  The jury could have reasonably concluded that such a tool was insufficient to discharge the City of its obligation to "take reasonable preventive measures *in advance of* harm occurring, not simply to respond to harms only after they occur."  *Cash*, 654 F.3d at 335 (emphasis added).

Plaintiff also introduced Commissioner Horn's "vulnerable inmates" memo, issued in January of 2007, as evidence that the City did have policies in place to protect certain other categories of detainees it deemed to be particularly "vulnerable."  Tr. at 245.  The DOC's definition of "vulnerable," however, did not include Plaintiff and—according to the City—could not include Plaintiff because "it is simply not unusual for inmates to not be affiliated with any type of SRG" and thus "the need for protection [of] such inmates would be too widespread for DOC to handle."  Def.'s Br. at 15.  Requiring the DOC to track and protect all unaffiliated inmates as "vulnerable" would thus be "nonsensical," the City argues, and it cannot be faulted for failing to implement a nonsensical policy.  Def.'s Reply (Dkt. 390) at 4-5.  The City misconstrues Plaintiff's claim.  Plaintiff's argument is not that he should have been monitored and protected simply by virtue of his non-affiliation with a gang, and that all non-affiliated inmates should be tracked to the same degree as SRG members; rather, it is that he should have been better protected given the multiple documented threats to, and prior attempts on, his life.

Warden Bailey testified that he could not recall receiving any other memos during his tenure as warden of GMDC that warned of "hits" on a detainee's life. Tr. at 226. The City does not explain now, nor did it at trial, why implementing a formal policy to protect detainees who had already been assaulted in the past or whom gang members had explicitly threatened to kill—a rare occurrence, according to Warden Bailey—would be nonsensical or infeasible.

Moreover, the "vulnerable inmates" policy—the only policy discussed in any meaningful way by the City in its briefs—was not the only policy that Plaintiff brought to the jury's attention at trial. During summation, Plaintiff highlighted the contrast between the City's efforts to "rigorously pursue the identification of security risk group members under [its] custody" and the lack of any procedure or mechanism through which the City could similarly "track a non-SRG member who had prior incidents with SRG members and who might be vulnerable to the influence that gangs have within housing facilities." Tr. at 953-54. This deficiency was underscored by the testimony of Officer Marrero, the officer tasked with monitoring Three Main on the night of the second attack, who had no way of knowing that Plaintiff had been the victim of a gang attack the previous day and thus could not have brought that fact to his area supervisor's attention, as he testified he would have done. Tr. at 400-402. Plaintiff also highlighted the City's use of "central monitoring" to monitor the movements of SRG members throughout the DOC's facilities. Inmates with CMC status were given red designator cards and escorted everywhere they went. Tr. at 954-55. Such a policy did not apply to Mr. Small nor any other similarly situated detainees who had suffered from prior gang attacks. Neither did the City's "serious verified threat" protocol, which was reserved for situations where correction employees or their family members were threatened by inmates, but not triggered when inmates threatened other inmates. *Id.* at 955. In short, in spite of the City's demonstrated ability to track,

monitor, escort, or otherwise proactively protect other categories of inmates or correction staff from danger, it did not implement any such policy with respect to detainees who had been targeted or assaulted by SRGs.  Instead, the jury was presented with evidence that the DOC's "biggest tool" for combatting gang violence was a purely reactive one: to "rearrest" the perpetrators after the fact, rather than take affirmative measures to prevent the assault in the first place.  Tr. at 198.

Finally, Plaintiff presented evidence that the City did not formally train its employees on how to curb the influence of SRGs or how to protect known targets of gang violence.  An unconstitutional policy, custom, or practice "may also be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004).  To demonstrate deliberate indifference in this context, a plaintiff must establish three facts: (i) that a policymaker knows to a "moral certainty" that the municipality's employees will confront a certain situation; (ii) either that the situation presents the municipal employee with a difficult choice of the type that training or supervision will make less difficult, or that there is a history of municipal employees improperly handling the situation; and (iii) that the wrong choice by the municipal employee will often cause the deprivation of an individual's constitutional rights.  *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).  In addition to deliberate indifference, a plaintiff ultimately must identify "a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Amnesty Am.*, 361 F.3d at 129.  In other words, a plaintiff must demonstrate that the constitutional injury "resulted from . . . a faulty training program rather than from negligent implementation of a sound program or other,

unrelated circumstances." *Id.* at 129-30.  A municipality's culpability for a deprivation of rights is "at its most tenuous where a claim turns on a failure to train."  *Connick*, 563 U.S. at 61.

The jury had a sufficient evidentiary basis to find for Plaintiff on his failure-to-train theory of *Monell* liability.  As already discussed, the City was on notice of the risk that detainees at Rikers could be violently assaulted by gang members.  Despite this, testimony at trial established that correction officers received little or no training on how to protect detainees from—or how to respond to—gang violence in general, let alone detainees being targeted by gangs in particular.  Although the three officers named as individual Defendants testified that they had learned at the correction academy how to identify gang members, none recalled being trained on how to limit the influence of SRGs.  Tr. at 856-57 (Officer Villacis), 865 (Officer Feinstein), 877 (Officer Simon).  The City argues that "the evidence showed that DOC trained its employees to identify and properly house vulnerable inmates and to protect those inmates from gang violence."  Def.'s Br. at 19.  Putting aside the fact that only one of the three correction officers even recalled such training, the City's point is unpersuasive not least because it conceded that repeat victims of gang assaults like Plaintiff were not considered to be "vulnerable" inmates and thus would not have been featured in such a training program.  The evidence was sufficient to show that the need for more and adequate training concerning the protection of inmates who had already been targeted or threatened by gangs should have been obvious to the City, such that the City may "reasonably be said to have been deliberately indifferent to the need."  *See City of Canton*, 489 U.S. at 390.

*Causation*

Of course, merely pointing to a potential shortcoming in agency policy or training is insufficient to establish *Monell* liability.  A plaintiff must also "demonstrate that, through its

deliberate conduct, the municipality was the moving force behind the alleged injury." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008).

The evidence adduced at trial was sufficient for a jury to infer that had the DOC instituted a policy of proactively protecting inmates who had been targeted by gangs, or trained its correction officers to do so, Plaintiff would not have suffered constitutional injury.  The City contends that "[e]ven if [P]laintiff attempts to argue that the Constitutional violation consisted of a series of mistakes over time . . . [he] has not articulated what the series of mistakes over time might have been."  Def.'s Br. at 13.  To the contrary, Plaintiff introduced evidence at trial that, among other things, he was moved into a more heavily Bloods-dominated housing unit after his first violent interaction with the Bloods; that the officer supervising him on the night of the second assault was not told about the attack the day before and left Plaintiff alone with his cell door unlocked; that Plaintiff was never informed about the "hit" on his life; that upon his return to Rikers in 2009, Plaintiff was placed into yet another Bloods-dominated facility; and that beyond moving him from place to place in reaction to each assault, the DOC took no preventive measures to keep the next attack from happening.  Viewed in the light most favorable to Plaintiff, the evidence was sufficient for a jury to conclude that the existence of a DOC policy providing for the proactive protection of known targets of gang violence may have prevented the Bloods from attacking him three times—four, including the September 2006 assault—in under three years.  And drawing all reasonable inferences in Plaintiff's favor, the jury could have found that had all the correction officers in Plaintiff's unit been informed about the Bloods' first attack, for example, they would have known better than to leave him unattended with his cell door unlocked the very next day; or, had Plaintiff's history with the Bloods been adequately tracked

and monitored, he would not have been transferred again and again into facilities that housed even more Bloods than those from which he came.

The City insists that Plaintiff has failed to establish a causal link between the DOC's policy and his constitutional injury, because even if Plaintiff had been designated or tracked as a "vulnerable" inmate, the DOC would have done nothing differently—getting put into close custody "is all that would have happened" to Plaintiff anyway. Def.'s Br. at 13. The outcome would have been unchanged, the City asserts, because Plaintiff "rejected the protective measures" that would have been extended to him had he been deemed "vulnerable" and that were in fact offered to him in any event. *Id.* at 16. The Court finds this argument unpersuasive.

Critically, the City's argument overlooks the fact that because Plaintiff was not adequately designated or tracked as a target of the Bloods, he was not even offered the possibility of close custody until after the second attack; thus, the policy could not have protected Plaintiff from the first two attacks. It also fails, as Plaintiff rightly notes, to take into account that he was never told about the confidential informant memos, which may have informed his decision to ask to leave close custody. Moreover, the Court is not convinced that Plaintiff's acceptance of close custody housing would have severed the causal connection between the DOC's policy or lack thereof and the third assault, which took place nearly two and a half years after Plaintiff requested to leave close custody. Plaintiff lived for two years without incident in GRVC—according to him, a Crips-dominated facility. But he was assaulted for the third time within months of being moved to AMKC, which he testified was "flooded with Bloods." It was not unreasonable for the jury to conclude that the DOC's decision to house Plaintiff in AMKC, notwithstanding his status as a repeat victim of attacks by the Bloods and without offering him any affirmative protection, caused the constitutional violation in March 2009. The City's

argument that "even if DOC policy existed in the manner suggested by [P]laintiff, it would not

have prevented any . . . violation of his rights," Def.'s Br. at 13, is thus unavailing.  Not only was

close custody housing not made available to Plaintiff until after the first and second attacks, it

was far from the only policy that he advocated for at trial.  Once again, the City fails to address

the host of other potential policies that Plaintiff identified, which could have been, but were not,

used to protect him.

A reasonable jury could have certainly viewed the trial evidence in a light more favorable

to the City.  But in adjudicating a motion for judgment as a matter of law, the Court must view

all of the evidence in the light most favorable to Plaintiff and draw all inferences in his favor.

*See Cash*, 654 F.3d at 339.  Upon doing so, the Court does not find that a reasonable jury was

compelled to return a verdict in the City's favor.  Accordingly, the City is not entitled to

judgment as a matter of law.

## II.    Motion for a New Trial

### A.  Legal Standard

A new trial may be granted "after a jury trial, for any reason for which a new trial has

heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Unlike

a Rule 50 motion for judgment as a matter of law, "a new trial may be granted even if there is

substantial evidence supporting the jury's verdict."  *Lewis v. Am. Sugar Refining, Inc.*, 325 F.

Supp. 3d 321, 332 (S.D.N.Y. 2018).  Whether a new trial is warranted under Rule 59(a) is a

question that is "committed to the sound discretion of the district court."  *Sequa Corp. v. GBJ

Corp.*, 156 F.3d 136, 143 (2d Cir. 1998).  "A motion for a new trial should be granted when, in

the opinion of the district court, the jury has reached a seriously erroneous result or . . . the

verdict is a miscarriage of justice."  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133

(2d Cir. 1998).  In deciding whether to grant a new trial, the trial court may weigh the evidence itself and "need not view it in the light most favorable to the verdict winner." *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998).  However, the trial court "must exercise [its] ability to weigh credibility with caution and great restraint," and may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).  "The court should only grant such a motion when the jury's verdict is 'egregious.'" *DLC Mgmt. Corp.*, 163 F. 3d at 134.

In the alternative, the City moves for a new trial on the basis of three purportedly erroneous evidentiary rulings.  The City acknowledges that a "trial court has broad discretion over the admission of evidence." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997).  Nevertheless, it argues that the Court erred in taking judicial notice of three outside complaints, excluding evidence of Plaintiff's criminal history, and declining to bifurcate the trial.  Because the Court does not find that the jury reached a "seriously erroneous result" or that the verdict was "a miscarriage of justice," a new trial is not warranted.  *See Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005).

### B.  Judicial Notice of Outside Complaints

The City first argues that the Court improperly took judicial notice of three civil complaints from other actions brought against the City, which Plaintiff introduced to support his *Monell* claim.  Each of these complaints contained allegations of civil rights violations stemming from incidents of inmate-on-inmate violence in the City's correction facilities.  The parties do not dispute that "courts routinely take judicial notice of documents filed in other courts, [] not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such

21

litigation and related filings." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). However, the City asserts that it was error for the Court to take judicial notice of these documents because "the effect was to give the jury the impression that the facts in those complaints had been proven." Def.'s Br. at 21.[8]

The City's argument has been considered and soundly rejected by the Second Circuit. *See Fiacco v. City of Rensselaer*, *N.Y.*, 783 F.2d 319, 328 (2d Cir. 1986); *Outlaw v. City of Hartford*, 884 F.3d 351, 380 (2d Cir. 2018). To prove deliberate indifference, a plaintiff must first establish "that the need for more or better supervision to protect against constitutional violations was obvious." *Amnesty Am.*, 361 F.3d at 127. This "obvious need may be demonstrated through," for example, "proof of repeated complaints of civil rights violations." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). The value and relevance of such evidence in the context of Section 1983 actions is clear. *See Outlaw*, 884 F.3d at 380 ("*Monell* liability, by its nature, will often turn on evidence concerning victims other than the plaintiffs."); *Fiacco*, 783 F.2d at 328 ("Since the existence of a policy . . . amounting to deliberate indifference to constitutional rights cannot be established by inference solely from evidence of the occurrence of the incident in question . . . a plaintiff cannot prevail on a § 1983 claim against a municipality without introducing other evidence.").

In *Fiacco*, the Second Circuit held that the trial court did not err in allowing the plaintiff to introduce third-party complaints at trial to establish notice to the City that "there was a possibility that its police officers had used excessive force." *Fiacco*, 783 F.2d at 328. "The fact

---

[8] The Court did exclude newspaper articles and complaints that detailed assaults at Rikers that post-dated the three attacks on Plaintiff because they "could not have affected the propriety of [D]efendants' conduct leading up to Small's assaults." Dec. 18, 2020 Tr. (Dkt. 316) at 54-56; *see Connick*, 563 U.S. at 63 n.7 ("[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates.").

that none of the claims had yet been adjudicated in favor of the claimant was not material." *Id.*

It concluded that any possible prejudicial effect was minimized by the trial court's repeated

limiting instructions to the jury that "there had never been any authoritative finding as to whether

or not any claimant's charge was valid" and that "the jury was neither to assume that the claims

were true nor to try to assess their truth." *Id.* Here, the Court similarly instructed the jury that it

should not assume the truth of the allegations contained in the third-party complaints. Tr. at 715

("Complaints contain allegations rather than statements of proven facts. These complaints are

thus not being offered for their truth, and you should not consider whether what is alleged in

them is or is not true."). Rather, it explained that the jury should decide for itself whether the

complaints provided or should have provided notice to the City that Plaintiff faced a substantial

risk of serious harm. *Id.* That the City found these curative instructions to be "ineffective,"

Def.'s Reply at 6, is insufficient to justify the extraordinary remedy of ordering a new trial.

The City further asserts that it is entitled to a new trial because "the alleged facts in those

other complaints were not similar to [P]laintiff's claims because they all involved instances of

inmate attacks occurring with the tacit approval, or even at the behest of, correction officers."

Def.'s Br. at 22. The incidents discussed in these other complaints, however, were not so

factually dissimilar as to be irrelevant. *See Edwards v. City of New York*, No. 14-CV-10058

KBF, 2015 WL 5052637, at *6 (S.D.N.Y. Aug. 27, 2015) ("That . . . [the] prior lawsuits

additionally raise other institutional problems within the DOC does not mean these sources are

irrelevant to plaintiff's allegations that there was a custom of the use of excessive force by DOC

officers against detainees."). In any case, the jury was entitled to decide how much weight to

ascribe to this evidence. *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 301 (2d Cir. 2020) ("It is

squarely within the province of the jury to decide, in determining municipal liability, what

weight this evidence should receive on the issue of a policymaker's actual or constructive notice of the unconstitutional conduct in light of all the evidence in this case.").  If the jury found that the factual allegations contained in the other complaints were insufficiently similar to the case at hand, it was empowered to discount such evidence in arriving at its verdict.  The admission of the three complaints was not erroneous, let alone a "miscarriage of justice."

### C.  Exclusion of Criminal and Prison Disciplinary History

Next, the City argues that it was error for the Court not to admit evidence of Plaintiff's criminal history and prison disciplinary history.  It claims that the burglary charges Plaintiff was facing, the "potentially lengthy sentence for that crime," his infraction history in prison, and the fact that he suffered a gunshot wound in 1992 all could have served as "alternate explanation[s] for the PTSD and depression" that Plaintiff claimed to have suffered as a result of the gang assaults.  Def.'s Br. at 25.  Exclusion of this evidence, the City argues, deprived it of its ability to properly defend itself against Plaintiff's arguments concerning damages.  The Court disagrees.

In ruling on the parties' motions in limine, the Court excluded this evidence under Federal Rule of Evidence 403 and 609 on the basis that such evidence would be substantially more prejudicial than probative, and could risk suggesting to the jury that Plaintiff is "violent by nature."  Jan. 20, 2021 Tr. (Dkt. 327) at 10, 34; Dec. 18, 2020 Tr. at 11.  On the one hand, evidence that Plaintiff had been charged with burglary was of minimal probative value as an alternate explanation for his emotional injuries because it would have already been obvious to the jury that he was facing the emotional stresses of incarceration and a possible prison sentence simply by virtue of his detention at Rikers.  Plaintiff's gunshot wound—which occurred 14 years prior to the first gang assault—was also of low probative value, in the Court's view, due to the passage of a significant amount of time.  On the other hand, the risk that the jury would

improperly render a verdict based on "a belief that bad people should not be permitted to recover from honorable . . . officers" was a serious concern.  *See Jackson v. City of White Plains*, No. 05-CV-0491 (NSR), 2016 WL 234855, at *4 (S.D.N.Y. Jan. 19, 2016) (quoting *Barber v. City of Chicago*, 725 F.3d 702, 714 (7th Cir. 2013)).

The Court recognizes that a plaintiff "who has had a number of prior arrests and detentions is likely to have suffered less distress [from arrest and detention] than one who has never before been detained."  *Banushi v. Palmer*, No. 08-CV-2937 KAM JO, 2011 WL 13894, at *3 (E.D.N.Y. Jan. 4, 2011), *aff'd*, 500 F. App'x 84 (2d Cir. 2012).  *Banushi* is distinguishable, however, because the plaintiff there was seeking damages for his alleged false arrest and false imprisonment.  *Id.*  Allowing the defendants in *Banushi* to establish that the plaintiff had been arrested multiple times before could have directly undermined his claim that he suffered emotional distress from the allegedly improper arrest at issue.  By contrast, in *Jackson v. City of White Plains*—a case more analogous to this one—where the plaintiff was seeking damages for emotional trauma arising out of a police assault, the defendant was "precluded from introducing evidence of Plaintiff's prior arrests to show his lack of emotional trauma or upset resulting from the alleged incident."  *See Jackson*, 2016 WL 234855, at *4.  As in *Jackson*, here, the Court "fails to see how [Plaintiff]'s prior *arrests* are in any way relevant to the emotional damages Plaintiff sustained as a result of the alleged *assault[s]*."  *Id.* (emphases added).

While the Court recognizes that some of the evidence the City sought to admit would have been somewhat probative—especially as to the issue of damages—it also had the potential to be highly prejudicial.  As the City itself acknowledges, district courts are given "broad discretion under Rule 403 to balance the probative value of evidence against the risk of

prejudice." *United States v. Awadallah*, 436 F.3d 125, 134 (2d Cir. 2006).  Accordingly, the Court declines to order a new trial on the basis of this purportedly erroneous evidentiary ruling.

### D.  Bifurcation of Trial

Lastly, the City asserts that it was error for the Court not to bifurcate trial on the municipal liability claim from trial on the claims against the individual Defendants.  "Rule 42(b) of the Federal Rules of Civil Procedure affords a trial court the discretion to order separate trials where such an order will further convenience, avoid prejudice, or promote efficiency.  Therefore, bifurcation may be appropriate where, for example, the litigation of the first issue might eliminate the need to litigate the second issue, or where one party will be prejudiced by evidence presented against another party." *Amato v. City of Saratoga Springs,* 170 F.3d 311, 316 (2d Cir. 1999).  Although a trial court has broad discretion to grant separate trials under appropriate circumstances, "for reasons of efficient judicial administration courts favor having only one trial whenever possible." *Buscemi v. Pepsico*, 736 F. Supp. 1267, 1271 (S.D.N.Y. 1990).

The City argues that because Plaintiff did not succeed on his underlying claims against the individual Defendants, he legally could not prevail on his *Monell* claim against the City; thus, had the Court bifurcated the trial, Plaintiff's claim against the City would not have survived.  It cites *Morales v. Irizarry* in support of this proposition.  No. 95CIV.5068(AGS)(HBP), 1996 WL 609416, at *1 (S.D.N.Y. Oct. 22, 1996) ("[S]ince the City's liability is derivative of the individual defendants' liability, and since the proof required to establish a *Monell* claim is substantially different from the proof necessary to establish individual liability, the most prudent course is to try the *Monell* claims separately.").  The City's argument reflects a mistaken understanding of the law.  For municipal liability to attach, the jury need only find that Plaintiff was the "victim of a federal law tort committed by persons for whose conduct the municipality

can be responsible," *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013), and it did, *see*

Verdict Form at 4 (finding that a "City employee" had violated Plaintiff's constitutional rights).

The law does not require the jury to find any of the named defendants liable.  Rather, municipal

liability can exist "even in the absence of individual liability" so long as "the injuries complained

of are not *solely* attributable to the actions of named individual defendants."  *Barrett v. Orange*

*Cty. Hum. Rts. Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) (emphasis added); *Golodner v. City of*

*New London*, 443 F. App'x 622, 625 (2d Cir. 2011) (same); *Lee v. City of Syracuse*, 446 F.

App'x 319, 323 (2d Cir. 2011) ("[T]he jury's finding that [the individual defendant] did not

violate Lee's constitutional rights does not shield the City from *Monell* liability.").  In this case,

the City's liability was not "derivative of the individual defendants' liability" because the

injuries complained of were not solely attributable to the acts or omissions of the individual

Defendants.  Plaintiff's *Monell* claim was premised on the City's unconstitutional failure to

implement a policy and/or train its officers to protect pretrial detainees from a known threat of

gang violence.  The jury was properly instructed that it could only hold the City liable if it found

that Plaintiff's constitutional rights were violated "either by the individual [D]efendants or by

some other City employee or employees," Jury Instructions at 16, and courts "presume that

jurors follow their instructions," *United States v. Williams*, 690 F.3d 70, 77 (2d Cir. 2012).  The

Court remains unconvinced that its decision not to bifurcate the trial was "seriously erroneous."

The Court further rejects the City's assertion that it was prejudiced because "the deep

pocket was left in the case" as speculative.  Cases brought against both individual and

institutional or corporate defendants are routinely tried at the same time, and juries are frequently

tasked with applying different standards to different parties.  Any potential prejudice to the City

could have been, and was, mitigated by appropriate jury instructions.  *See Santiago v. City of New York*, No. 90 CIV. 5233 (RWS), 1992 WL 116605, at *2 (S.D.N.Y. May 15, 1992).

## III.   Motion for Remittitur

### A.  Legal Standard

"While it is properly within the province of the jury to calculate damages, there is an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable persons may differ, but a question of law."  *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 327 (S.D.N.Y. 2016).  A district court has authority to enter a conditional order of remittitur, compelling a plaintiff to choose between reduction of an excessive verdict and a new trial, in two situations: "(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken" and "(2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Trademark Research Corp. v. Maxwell Online*, Inc., 995 F.2d 326, 337 (2d Cir. 1993).  Where there is no particular discernable error, a jury's award may not be set aside as excessive unless "the award is so high as to shock the judicial conscience and constitute a denial of justice." *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988).  To determine whether an award is so high as to "shock the judicial conscience," the Court must consider the amounts awarded in other, comparable cases.  *See Mathie v. Fries*, 121 F.3d 808, 813 (2d Cir. 1997).  If the Court finds that remittitur is warranted, it "should reduce the verdict only to the maximum that would be upheld by the trial court as not excessive."  *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990).

### B.  Reasonableness of Award

As an initial matter, the Court rejects the City's argument that because the jury returned a verdict in favor of each of the individual Defendants, Plaintiff should not be compensated for "damages stemming from the incidents involving those defendants, in other words, the entirety of [P]laintiff's injuries presented at trial."  Def.'s Br. at 29.  As already discussed above, the City's argument reflects a mistaken understanding of the legal relationship between individual and municipal liability in Section 1983 cases.  The jury found that "a City employee violated [Plaintiff's] constitutional rights in connection with the alleged assaults that occurred on October 14 and 15, 2006 and March 9, 2009."  Verdict Form at 4.  Thus, the City's contention that there was no identifiable constitutional violation for which to compensate Plaintiff is incorrect.

The City next argues that remittitur is justified in this instance because the jury's award of $1.5 million included impermissibly speculative emotional damages and because the award was intrinsically excessive, such that it "shocks the conscience."  It is well-established that courts may award emotional distress damages in Section 1983 cases.  *Miner v. City of Glens Falls*, 999 F.2d 655, 662 (2d Cir. 1993); *see also Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 907 (2d Cir. 1993) ("It is axiomatic that civil rights plaintiffs may recover compensatory damages for emotional distress.").  The damages award "must be supported by competent evidence concerning the injury."  *Patrolmen's Benevolent Ass'n. of City of New York v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002).  A plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages.  *Id.*  Rather, "the plaintiff's testimony of emotional injury must be substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress, or the objective circumstances of the violation itself."  *Id.*  And evidence that a plaintiff has sought medical

29

treatment for the emotional injury, while helpful, *see, e.g.*, *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 581 (2d Cir. 1989), is not required, *see Miner*, 999 F.2d at 663.

The jury's award was supported by competent evidence of Plaintiff's emotional injury, injury that rose above the level of "garden variety."  For "garden variety" emotional distress claims, which generally merit awards between $30,000 to $125,000, "the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319-20 (S.D.N.Y. 2018).

Here, Plaintiff's claims of emotional injury were supported both by medical corroboration and the objective circumstances of the constitutional violations.  It is true that much of the relevant evidence of injury came from Plaintiff himself, who testified that he suffered from dizziness, nausea, flashbacks of getting beaten, and random bouts of crying, both immediately after the attacks and still to this day.  *See* Tr. at 88, 94-95 ("It's just hard to deal with.  I'm still having flashbacks, still having crying.  I don't understand why I'm crying, you know.  I don't know how to explain it.").  But Plaintiff's testimony was also corroborated by mental health clinician Angela Taglione, who evaluated Plaintiff after the attacks and diagnosed him with post-traumatic stress disorder (PTSD) and depression.  *See* Tr. at 271-75.  And the City cannot dispute that the objective circumstances of the constitutional violations were themselves egregious.  While he was in the City's care, Plaintiff was brutally assaulted by members of a notoriously violent gang three times.  The first two assaults occurred within the same 48-hour period.  During the second incident, Plaintiff was outnumbered by his attackers ten-to-one. Twice he was slashed with a razor blade.  And after each incident, Plaintiff received medical care at either the prison infirmary or the hospital.  The objective circumstances of the three attacks

were all substantiated by testimony from other witnesses, almost all of which were the City's

own employees.  That Taglione did not specifically identify a causal relationship between the

attacks and Plaintiff's PTSD and depression is of little consequence; the jury was entitled to infer

that Plaintiff's lasting emotional trauma bore some relationship to the three violent assaults he

endured during his time at Rikers.  *See Tatum v. Jackson*, 668 F. Supp. 2d 584, 600 (S.D.N.Y.

2009) ("It would be 'quite reasonable' for a jury to find that [plaintiff] suffered emotional

distress as a result of his experience.").  Plaintiff's own testimony, coupled with the

corroborating testimony of his mental health provider and witnesses to the three assaults, is

sufficient to allow him to recover for his emotional damages.  *See Miner*, 999 F.2d at 663

(upholding compensatory damages award for emotional distress based on testimony of plaintiff

and his wife); *see also Bouveng*, 175 F. Supp. 3d at 328 ("A court is not required to remit a large

non-economic damage award, even where evidence of emotional damage consists solely of

plaintiff's testimony.").  The Court does not find that the compensatory damages award exceeded

the bounds of what is permissible, even considering Plaintiff's emotional injuries alone.  *See*

*Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 163 (2d Cir. 2014) (upholding $1.32 million

award for "exclusively intangible harms," where the plaintiff endured years of "psychological

abuse leading to a marked decline in [his] mental health and well-being" that caused him to be

"hospitalized and diagnosed with, *inter alia*, post-traumatic stress disorder, depression, and panic

disorder as a result of the harassment that he suffered").

In any event, Plaintiff's emotional injuries were accompanied by significant physical

injuries.  Where, as here, the jury "did not specify the categories of damages it awarded," the

Court should "consider whether the award as a whole is excessive to compensate [Plaintiff] for

the injuries and losses that were supported by the evidence."  *Tatum*, 668 F. Supp. 2d at 601-02.

Upon comparison to similar cases involving both physical and emotional injuries, the Court cannot say that the damages award here is outside the range of reasonableness. *See, e.g.*, *Jackson v. Tellado*, No. 11CV3028PKCSMG, 2018 WL 4043150, at *5-6 (E.D.N.Y. Aug. 24, 2018) (remitting $12.5 million award to $2.75 million where the plaintiff was pepper-sprayed in the face by police officers, repeatedly struck in the face and body, and suffered a fractured hand, depression, nightmares, flashbacks, and anxiety); *Ismail v. Cohen*, 899 F.2d 183, 186-87 (2d Cir. 1990) (affirming award of $650,000 where plaintiff was beaten by police officer, sustained head trauma, displaced vertebrae, and cracked ribs, and suffered from considerable mental and emotional injury); *Tatum*, 668 F. Supp. 2d at 600-03 (declining to remit $1 million award where plaintiff was assaulted by other inmates and suffered a broken jaw that required surgery, lasting depression, and limited ability to engage in basic daily activities such as eating and laughing); *Rangolan v. Cty. of Nassau*, 370 F.3d 239, 245 (2d Cir. 2004) (affirming $800,000 where plaintiff was assaulted by another inmate, which caused a skull fracture that necessitated emergency brain surgery, post-concussion syndrome, and lasting depression, headaches, and seizure disorder); *Guzman v. Jay*, 303 F.R.D. 186, 197-99 (S.D.N.Y. 2014) (declining to remit $2.2 million award where plaintiff was maced and thrown to the ground by a police officer and sustained irreparable damage to his peroneal nerve, a torn ACL and PCL, a permanent foot injury that would require him to walk with an ankle device, posttraumatic arthritis, and would likely need a knee replacement in 20 years).[9]   The Court thus finds that the jury's $1.5 million award does not "shock the conscience" and that remittitur is unwarranted here.

---

[9] When comparing the damages awarded in earlier cases to the case at hand, the Court must take into account inflation. *See DiSorbo v. Hoy*, 343 F.3d 172, 185 (2d Cir. 2003).  The $650,000 award in *Ismail*, for example, is roughly equivalent to $1,444,009 million in June 2021 dollars. *CPI Inflation Calculator*, United States Bureau of Labor Statistics, http://www.bls.gov/data/inflation_calculator.htm (last visited Apr. 6, 2022).  It is thus comparable to the jury's award in this case at the time it rendered its verdict.

**CONCLUSION**

For the reasons stated above, Defendant's motion for judgment as a matter of law, a new trial, and remittitur is denied.  The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 375, enter judgment for Plaintiff, and close this case.[10]

SO ORDERED.

Dated:     April 28, 2022
           New York, New York

_____
RONNIE ABRAMS
United States District Judge

---

[10] The Court thanks Plaintiff's pro bono counsel for their thorough and thoughtful advocacy on his behalf.